IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | |
|---|---|
| MAXIM HEALTHCARE STAFFING SERVICES, INC. AND MAXIM HEALTHCARE SERVICES HOLDINGS, INC. <br><br> Plaintiffs, <br><br> vs. <br><br> DAVID COATS <br><br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> )　Case No. 23-2194 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

Plaintiffs Maxim Healthcare Staffing Services, Inc. ("Maxim Staffing") and Maxim Healthcare Services Holdings, Inc. ("Maxim"), through their undersigned counsel, file this Complaint against Defendant David Coats ("Coats"). In support of their Complaint, Plaintiffs state as follows:

## FACTUAL ALLEGATIONS

1.       Plaintiffs bring this suit seeking relief for violations by Coats, a former employee of Maxim's subsidiary Maxim Staffing, of the Maxim Healthcare Services Holdings, Inc. Incentive Investment Plan ("IIP"). Specifically, Coats violated the terms of the IIP by either directly or indirectly: (1) engaging in business activity competitive with Maxim and its subsidiaries (collectively the "Companies" as defined within the IIP) within thirty (30) months following his separation from employment; (2) soliciting the Companies' clients, and diverting business away from the Companies; (3) soliciting at least one employee to leave the Companies to become employed by a direct competitor; (4) misappropriating the Companies' confidential and

proprietary information to benefit the Companies' direct competitor SnapNurse; and (5) failing to return nearly half a million dollars that Maxim paid to Coats in exchange for *not* engaging in such activities.

2.      Due to his decision not to comply with the terms of the IIP, Coats also rendered himself ineligible to receive additional payments under the IIP.

3.      Plaintiffs seek recovery of all monies paid to Coats under the IIP and a declaratory judgment holding that no additional payments are due to Coats under the IIP.

4.      The IIP is an unfunded "top hat" plan governed by ERISA that provides deferred income to a select number of highly compensated employees of the Company under ERISA § 201(2), 29 U.S.C. §1051(2).

### Jurisdiction and Venue

5.      Maxim is a Delaware corporation.

6.      Maxim Staffing is a Maryland corporation, with its headquarters located at 7227 Lee Deforest Drive in Columbia, Maryland.

7.      The IIP is an ERISA plan governed by ERISA, 29 U.S.C. § 1001 *et seq*. and administered by Maxim.

8.      In December 2019, Maxim Healthcare Services Holdings, Inc. assumed sponsorship of the Plan from Maxim Healthcare Services, Inc. ("Maxim Healthcare"). Maxim's Board of Directors, via a Committee (as defined by the IIP) appointed by the Board, has the authority, responsibility, and discretion to determine eligibility for coverage, make factual determinations, make coverage determinations, conduct a full and fair review of each denied claim, process and make payment on claims, adjudicate plan members' appeals relating to adverse benefits decisions, and to pursue overpayments, fraud, waste, and abuse, on behalf of the IIP.

HB: 4881-7077-7967.8

9.      Upon information and belief, Coats is an individual residing in Lutz, Florida.

10.     Coats has exhausted his administrative remedies under the Plan relating to the claims raised by Maxim.

11.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, ERISA Section 502(a)(3), and 29 U.S.C. § 1132(a)(3), as Maxim is a fiduciary of the IIP seeking to recover other appropriate relief from Coats related to enforcement of the IIP's terms.

12.     Jurisdiction over the issues presented in this Complaint is exclusive to the district courts of the United States under ERISA Section 502(e)(l), 29 U.S.C.§ 1132(e)(l).

13.     This Court has supplemental jurisdiction over Maxim's state-law claims pursuant to 28 U.S.C. § 1367 because the counterclaims are inextricably intertwined with Coat's claims such that they form part of the same case or controversy.

14.     Venue over this Complaint is proper in the United States District Court for the District of Maryland under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), which provides for venue in the district where the plan is administered. Venue is also proper under 29 U.S.C. § 1391(b)(2)-(3).

<u>**The Companies**</u>

15.     The Companies are an industry leader in the highly competitive business of recruiting and staffing medical professionals on a temporary or permanent basis to healthcare facilities across the nation.

16.     Since 1988, the Companies have connected the nation's top talent to a variety of healthcare partners by staffing medical professionals such as nurses, allied health professionals, locum tenens, travel nurses, medical coders, and others with its clients. Along with healthcare staffing, the Companies also provide staffing for schools and other educational service clients.

HB: 4881-7077-7967.8

17.      The Companies' staffing and workforce management clients include, but are not limited to, hospitals, nursing homes, government facilities, school districts, and other facilities. Among other clients, the Companies also contract with several federal and state agencies to provide healthcare staffing and workforce management solutions.

18.      The Companies provide services to clients across the nation, and Maxim Staffing has physical offices in 33 states, including Maryland.

## Maxim's Employment of Coats

19.      In December 2014, Maxim Healthcare Services, Inc. hired Coats as its National Director.

20.      In 2016, Coats was promoted to the position of Vice President of Strategic Staffing and Business Lines for Maxim Staffing.  Coats was based out of Maxim Staffing's Tampa, Florida office located at 3109 W. Dr. Martin Luther King Jr. Boulevard, Suites 500 and 501, Tampa, FL 33607.

21.      As the Vice President of Strategic Staffing and Business Lines for Maxim Staffing, Coats was responsible for, among other things, driving Maxim Staffing's strategic vision and engaging in strategic planning for sales and marketing. He was responsible for staffing sales and marketing, including contract negotiations and developing business. He was also responsible for working closely with the Companies' leadership to identify priorities and values to increase business growth. He oversaw new business deals and screened business deals by analyzing market strategies, deal requirements, and financials; evaluating options; resolving internal priorities; and recommending equity investments. He communicated with the Companies' leadership about market trends and opportunities. Coats was also involved in the development of Maxim Staffing's national sales strategy. Ultimately, he was responsible for providing ongoing guidance on business

HB: 4881-7077-7967.8

development platforms, processes, roles, and responsibilities for continuous improvement of new business with Maxim Staffing. Coats controlled and directed work out of Maxim Staffing offices nationwide and supervised personnel performing work out of these offices.

22.     Because Coats was responsible for Maxim Staffing's national strategy for sales and marketing, he had extensive access to the Companies' confidential, propriety, and trade secret information.

23.     Given Coats' role, together with working out of Maxim Staffing's Tampa, FL office, he often worked in other offices located throughout the country, including working from Maxim Staffing offices located in Dallas, TX; Raleigh, NC; Cleveland, OH; Boston, MA; Pittsburgh, PA; and Maxim Staffing's headquarters in Columbia, MD.

24.     Coats resigned from Maxim Staffing in June 2022 and was officially separated from employment on July 1, 2022.

### Incentive Investment Plan Terms and Payment to Coats Pursuant to IIP

25.     The IIP is designed to provide a method through which a select group of management or highly compensated employees of the Companies (as defined in the IIP) may become eligible to acquire an interest in the economic progress of the Companies, and as an incentive to promote the best interests of the Companies, in particular the long-term economic growth of the Companies. The IIP is attached as Exhibit 1. **Exhibit 1, IIP at ¶ 1.**

26.     IIP Participants are eligible to earn IIP Units. A "Unit" equals the Fair Market Value of one share of Maxim's common stock, plus the aggregate amount of all Tax Dividends declared and paid on Maxim's common stock before December 31, 2012. **Exhibit 1, ¶ 7.**

27.     Each year, the Committee selects the Participants (as defined in the IIP) eligible to earn IIP Units and determines the number of Units each Participant is eligible to earn. For

HB: 4881-7077-7967.8

purposes of the IIP, the Committee is the Board of Directors of Maxim (as defined in the IIP), or

if context suggests, the Board of Directors of any of Maxim's subsidiaries, or a committee

appointed by the Board. **Exhibit 1, ¶¶ 2(b), (e), and 6.**

28.    Units "are not to be considered or deemed wages" and they "have no value other

than as potentiality of income that may be earned in accordance with the terms and conditions of

th[e] Plan." **Exhibit 1, ¶ 6.**

29.    In order to earn and become entitled to receive payment for Units, the Participant

must comply with the terms set forth in Paragraph 9 of the IIP. **Exhibit 1, ¶ 9.**

30.    Under Paragraph 9, the Participant must not, during the thirty (30) month period

following the date of his or her Separation from Service, either directly on his or her own behalf,

or indirectly through any entity in, or on behalf of or with respect to which, the Participant is an

officer, director, trustee, shareholder, creditor, employee, partner, or consultant:

    a.    Engage in the business of (a) recruiting, employing and/or providing the services of registered nurses, licensed practical nurses or licensed vocational nurses; certified nursing assistants; home health aides; companions; speech, physical, or occupational therapists; medical coders or billers; travel nurses and physicians; locum tenens physicians and/or other allied health personnel on a temporary or permanent basis in a home health or facility setting, (b) selling or otherwise furnishing home, durable or other medical equipment (including, but not limited to, respiratory supplies), or (c) selling or otherwise furnishing any other lines of business that the Companies engage in, enter or prepare to enter during the Participant's employment with the Companies (collectively, the "Companies' Business"), in which the Participant performed work or obtained knowledge and information during the two (2) year period preceding his or her Separation from Service, within a radius of two hundred fifty (250) miles of the office in which the Participant last worked or any other office in which the Participant worked during the two (2) years preceding his or her Separation from Service, or as much thereof as a Court of competent jurisdiction deems reasonable; **Exhibit 1, ¶ 9(1);**

    b.    Approach, contact, solicit or induce any individual, corporation or other entity which is a client or customer of any of the Companies, about which Participant obtained knowledge by reason of Participant's employment by the Companies, in an attempt to: (a) enter into any business relationship with a client or customer of any of the Companies if the business relationship is competitive with any aspect

of Companies' Business in which Participant worked during the two (2) year period preceding his or her Separation from Service, or (b) reduce or eliminate the business such client or customer conducts with the Companies; **Exhibit 1, ¶ 9(2);**

c.   Approach, contact, solicit or induce any Regular Employee of the Companies: (a) to provide services to any individual, corporation or entity whose business is competitive with any of the companies, or (b) to leave the employ of any of the Companies; **Exhibit 1, ¶ 9(3)**;

d.   In any way, solicit, divert or take away any staff, temporary personnel, trade, business, or good will from the Companies; solicit accounts or personnel which became known to the Participant through his or her employment with the Companies; influence or attempt to influence any of the Companies' customers or personnel not to do business with the Companies; divulge the name or address or any information concerning any account of the Companies to any other person or company; or disclose any confidential or proprietary information or knowledge acquired by the Participant while in the employ of the Companies, which restriction shall include the Companies' business methods, techniques, and management and financial expertise, as well as their plans with respect to acquisitions and future services to be rendered **Exhibit 1, ¶ 9(5);** or

e.   Use, divulge or disclose proprietary, trade secret or confidential information of the Companies. **Exhibit 1, ¶ 9(6).**

31.   The IIP is governed by Maryland law, except to the extent preempted by federal law. **Exhibit 1, ¶ 9(6).**

32.   Coats was later awarded Units, executed Award Agreements, and agreed to abide by the terms of the IIP.

33.   By accepting participation in the IIP, Coats acknowledged and agreed that the terms set forth in Paragraph 9 of the Agreement were material and essential terms of the IIP.

34.   Although the right to receive payments under the IIP is conditioned upon compliance with the provisions of Paragraph 9 for 30 months, payments under the IIP begin at an employee's separation from service. A Participant is paid 20% of the amount credited to their account following separation of service. At the end of the 30-month period, the Participant is paid the final 80% payment. **Exhibit 1, ¶ 9(6).**

35.    Participants are not entitled to payments "until payments . . . are earned in accordance with Section 9 of the Plan." **Exhibit 1, ¶ 7.**

36.    Following Coats' separation from employment with Maxim Staffing, Maxim sent Coats a letter reminding him of the conditions required for payment of his units under Paragraph 9 of the IIP:

> Pursuant to the terms of the Plan, your ability to earn and receive payment for the units, and the Company's obligation to pay you for the value of the units, are subject to your compliance with and fulfillment of the terms and conditions contained in Paragraph 9 of the Plan. You acknowledge and agree that any breach or non-performance by you of the terms and conditions of Paragraph 9 of the Plan will terminate your ability to earn the units and release the Company from its payment obligations with respect to the vested, units allocated to your account. **In addition, in such an event, you agree to refund to the Company any amounts previously paid to you or applied for your benefit with respect to such units.**

**Exhibit 2, July 26, 2022 Letter to Coats** (emphasis added).

37.    Coats signed and acknowledged the July 26, 2022 letter that same day and returned a signed copy to Maxim. **Exhibit 2.**

38.    Thus, Maxim paid Coats $484,180.40 in accordance with the IIP.

39.    By accepting this payment, Coats represented to Maxim that he intended to comply with the terms of the IIP, including the terms of Paragraph 9 of the IIP that required him not to engage in certain competitive activities and not to misappropriate the Companies' confidential information to be eligible for the payment. Coats also represented and agreed that if he violated the terms of the IIP, including Paragraph 9, he would refund any amounts previously paid to him under the IIP.

**Coats Becomes Employed by SnapNurse, Maxim's Direct Competitor**

40.    In August 2022, Coats became employed by the Companies' competitor,

8

SnapNurse.

41.    SnapNurse staffs medical professionals and nurses with its clients. In other words, it assists healthcare facilities with their staffing needs. SnapNurse's website claims it has staffed over 20,000 clinicians with 1,000 healthcare facilities across the country to date.

42.    Coats served as SnapNurse's Chief Sales Officer, physically working from his home in Lutz, FL and out of SnapNurse's offices in Atlanta, GA and Scottsdale, AZ.

43.    In his role as Chief Sales Officer for SnapNurse, which was substantially similar to his role at Maxim Staffing, Coats engaged in business development and national sales strategy. Multiple individuals reported directly and indirectly to Coats, including the SnapNurse post-acute, long-term care, and correctional sales teams, the account management teams, and the acute care teams. He was also himself involved in direct sales activities for SnapNurse.

44.    Coats' SnapNurse teams performed sales functions within 250-miles from the Companies' offices, and from the offices in which Coats worked during the two years preceding his separation from service with Maxim Staffing.

45.    Upon information and belief, in or around May 2023, Coats' employment with SnapNurse ended.

**Coats Did Not Comply with the Terms of the IIP**

46.    In order to earn payment under the IIP, Coats was required to refrain from engaging in certain competitive activities for 30 months following his separation from employment on July 1, 2022. That 30-month period concludes January 1, 2025.

47.    Despite representing to the Companies that he intended to comply with the terms of the IIP, Coats chose to engage in activities that violated the terms of the IIP by engaging in prohibited competitive activity in violation of Paragraph 9(1), soliciting the Companies' clients

and diverting business away from the Companies in violation of Paragraph 9(2), attempting to solicit the Companies' employees in violation of Paragraph 9(3), diverting business away from the Companies in violation of Paragraph 9(5), and misappropriating the Companies' proprietary business information in violation of Paragraph 9(6) of the IIP.

48.    Maxim is granted discretionary authority under Paragraph 17 of the IIP to determine eligibility for benefits and to construe the terms of the IIP, so the Court shall apply the highly deferential arbitrary-and-capricious standard of review for the appropriate interpretation of the IIP.

### Coats Did Not Comply with Paragraph 9(1) of the IIP

49.    Despite representing to the Companies that he intended to comply with the terms of the IIP, Coats did not comply with Paragraph 9(1) of the IIP, which required him not to, directly or indirectly:

> Engage in the business of (a) recruiting, employing and/or providing the services of registered nurses, licensed practical nurses or licensed vocational nurses; certified nursing assistants; home health aides; companions; speech, physical, or occupational therapists; medical coders or billers; travel nurses and physicians; locum tenens physicians and/or other allied health personnel on a temporary or permanent basis in a home health or facility setting, (b) selling or otherwise furnishing home, durable or other medical equipment (including, but not limited to, respiratory supplies), or (c) selling or otherwise furnishing any other lines of business that the Companies engage in, enter or prepare to enter during the Participant's employment with the Companies (collectively, the "Companies' Business"), in which the Participant performed work or obtained knowledge and information during the two (2) year period preceding his or her Separation from Service, within a radius of two hundred fifty (250) miles of the office in which the Participant last worked or any other office in which the Participant worked during the two (2) years preceding his or her Separation from Service, or as much thereof as a Court of competent jurisdiction deems reasonable. **Exhibit 1, ¶ 9(1).**

50.    Coats accepted an executive level role, Chief Sales Officer, with SnapNurse in or around August 2022. SnapNurse publicly represented that it was in "the business of recruiting, employing and/or providing the services of registered nurses, licensed practical nurses or licensed

10

vocational nurses; certified nursing assistants; home health aides; companions; speech, physical or occupational therapists; medical coders or billers; travel nurses and physicians; locums tenens physicians and/or other allied health personnel on a temporary or permanent basis in a home health or facility setting." Moreover, it represents itself as having deployed clinicians to health care facilities across the country.

51.     The Honorable Paula Xinis, presiding over separate litigation between Maxim and SnapNurse in the United States District Court of the District of Maryland, stated on the record that it is an "obvious fact" that SnapNurse and Maxim Staffing are competitors. **Exhibit 3, Transcript of Motion Hearing, May 23, 2023, No. 8:23-CV-00115, at 63:9-14 (D. Md.)**. One of Coats' former direct reports at SnapNurse—who also worked for Maxim Staffing—declared under oath that SnapNurse competes directly with Maxim Staffing for clients. **Exhibit 4, Declaration of Jerome Charles, May 22, 2023, Case No. 8:23-cv-00115-PX, ¶ 18.**

52.     In light of Coats' executive position at SnapNurse, and as a member of an 8-person leadership team for SnapNurse, Coats directly and indirectly engaged in competitive activity within the 250-mile restricted area described in Paragraph 9(1) of the IIP by leading SnapNurse's sales staff and business strategy throughout the country. This conduct violated Paragraph 9(1) of the IIP.

53.     Moreover, upon information and belief, Coats worked for SnapNurse controlling its sales strategy from his home in Lutz, FL, which is within 250 miles of Maxim Staffing's Tampa, FL office—the Maxim Staffing office from which Coats was based. As such, when he performed work for SnapNurse from his home, he was in violation of Paragraph 9(1) of the IIP.

54.     Further, SnapNurse employed direct sales employees—supervised by Coats— who conducted sales activities in Florida, Maryland, North Carolina, Ohio, and Pennsylvania, all

11

of which are states that contain offices from which Coats worked for Maxim Staffing within the two-year period preceding his separation from employment. The 250-mile restriction from those offices also extended into the states of South Carolina, New Jersey, and New York, which were also locations in which SnapNurse's sales professionals, supervised by Coats, conducted activities in competition with Maxim Staffing. Thus, Coats also engaged in prohibited competitive activity through his direct and indirect reports at SnapNurse in violation of Paragraph 9(1) of the IIP.

55.     Upon information and belief, since at least June 2023, Coats has been serving as Chief Revenue & Strategy Officer at Cell Staff, a self-described "national healthcare staffing company" in violation of Paragraph 9(1) of the IIP. Cell Staff's website specifies it is headquartered at 1715 N. Westshore Blvd. Suite 525, Tampa, FL 33607, which is within 250 miles of Maxim Staffing's Tampa, FL office and Coats' home in Lutz, FL. Thus, Coats continues to violate Paragraph 9 of the IIP even after leaving his employment with SnapNurse.

### Coats Failed to Comply with Paragraph 9(2) of the IIP

56.     As outlined above, Paragraph 9(2) of the IIP prohibits Participants from certain contact and solicitation of the Companies' clients that the Participant gained knowledge about because of their employment with the Companies.

57.     While Coats was employed by SnapNurse, at least one employee supervised by Coats, and, upon information and belief, others supervised by Coats, engaged in the solicitation of the Companies' current, past, and prospective clients and customers with Coats' knowledge and encouragement in violation of Paragraph 9(2) of the IIP.

58.     Coats instructed, encouraged, and helped SnapNurse employees to solicit at least one of the Companies' clients, and upon information and belief others, to conduct business with SnapNurse in violation of Paragraph 9(2) of the IIP.

HB: 4881-7077-7967.8

59.    Coats asked a former Maxim Staffing employee, who was then employed by SnapNurse, to solicit the Companies' customers and clients to obtain their business in violation of Paragraph 9(2) of the IIP.

**Coats Did Not Comply with Paragraph 9(3) of the IIP**

60.    As outlined above, Paragraph 9(3) of the IIP prohibits Participants from contacting and soliciting certain of the Companies' employees.

61.    In October 2022, Coats instructed Jamie Barber, a Senior Vice President for SnapNurse, to pursue Jerome Charles, who was then employed by Maxim Staffing in a Vice President of Business Development position, for employment with SnapNurse. Upon Coats' direction and recommendation, Ms. Barber contacted, and ultimately hired, Mr. Charles for employment at SnapNurse. **Exhibit 5, Transcript of Deposition of Jamie Alex Barber 77:17-78:5, 83:21-84:21.** Coats' direct and indirect involvement in the solicitation of Mr. Charles violated the terms of Paragraph 9(3) of the IIP.

62.    As Chief Sales Officer, Coats approved the hire of Mr. Charles, and assisted in the formulation and approval of the compensation package offered by SnapNurse to Mr. Charles in violation of Paragraph 9(3) of the IIP.

63.    In addition, at least two other Maxim Staffing employees in sales roles resigned and accepted employment with SnapNurse after Coats' departure from Maxim Staffing. Coats was actively involved in SnapNurse's hiring process for at least one former Maxim Staffing employee who accepted employment with SnapNurse.

**Coats Did Not Comply with Paragraph 9(5) of the IIP**

64.    As outlined above, Paragraph 9(5) of the IIP prohibits Participants from, among other things, soliciting or taking away business and goodwill from the Companies.

HB: 4881-7077-7967.8

65.     Coats violated Paragraph 9(5) of the IIP by, among other things, broadcasting his new role with SnapNurse on LinkedIn and claiming that SnapNurse is "the future of healthcare staffing." Coats' public statements to the business community, including customers and prospective customers of Maxim Staffing, as a former, high-level employee of Maxim Staffing, necessarily harmed and diverted goodwill from the Companies.

66.     In connection with litigation between Maxim Staffing and SnapNurse, Mr. Charles, a former Maxim Staffing employee who was subsequently employed by SnapNurse executed a sworn declaration that reveals that, during his employment with SnapNurse, Mr. Charles engaged in the solicitation of the Companies' leads, potential clients, and customers with the knowledge and encouragement of Coats. **Exhibit 4, Declaration of Jerome Charles, May 22, 2023, Case No. 8:23-cv-00115-PX, ¶ 37, 39.**

67.     Mr. Charles' declaration also states that Coats instructed, encouraged, and assisted Mr. Charles in soliciting the Companies' clients to conduct business with SnapNurse. **Exhibit 4, at § V., V.b.** This conduct by Coats violated Paragraph 9(5) of the IIP.

68.     Coats engaged in the direct and indirect solicitation of the Companies' clients and prospective clients in violation of Paragraph 9(5) of the IIP.

### Coats Did Not Comply with Paragraph 9(6) of the IIP

69.     As outlined above, Paragraph 9(6) of the IIP prohibits Participants from using or disclosing the Companies' proprietary, trade secret, and confidential information.

70.     Coats repeatedly used, divulged, and disclosed the Companies' proprietary information in connection with his employment with SnapNurse in violation of Paragraph 9(6) of the IIP.

71.     For example, a forensic analysis of Coats' work computer demonstrated that Coats

HB: 4881-7077-7967.8

accessed the Companies' proprietary business development information in May 2022, after being involved in communications with SnapNurse regarding future employment.

72.     Coats' indirect report at SnapNurse, Mr. Charles, declared under oath that he divulged and used the Companies' confidential information and trade secrets during his employment at SnapNurse with the knowledge and encouragement of Coats.

73.     Coats also received and utilized the Companies' proprietary, confidential, and trade secret information from Mr. Charles while Coats and Mr. Charles were both employed by SnapNurse. Coats knew said documents and information provided to him by Mr. Charles were taken from the Companies.

74.     On May 23, 2023, the Honorable Paula Xinis, the federal judge presiding over the litigation between Maxim Staffing and SnapNurse in Case No. 8:23-CV-00115, stated on the record that the evidence presented revealed that Coats encouraged Charles to share Maxim Staffing's business strategies and pricing information with SnapNurse, "with the knowledge that Charles was prohibited from sharing such information." **Exhibit 3, at 125:6-10.**

75.     Although he knew of the terms set forth in Paragraph 9 of the IIP, Coats did not disclose to Maxim that he violated the terms of the IIP. He also failed to repay the IIP payment that he received that was conditioned upon his compliance with the IIP's terms.

## The Committee Determines Coats Is Not Eligible for IIP Payments

76.     On January 18, 2023, Maxim sent Coats a letter informing him that the Committee determined he violated the terms of the IIP, and he was ineligible to receive any payments under the IIP.  **Exhibit 6, January 18, 2023 Letter to David Coats.**

77.     Within the January 18, 2023 letter, Maxim outlined the evidence that led the Committee to reach its determination. *See* **Exhibit 6.** The Committee outlined that Coats violated

the IIP by diverting business and goodwill from the Companies through a public LinkedIn posting. It also noted that Coats, in his role as a senior leader of SnapNurse, directly and indirectly engaged in prohibited competitive at SnapNurse. The letter also alerted Coats that Maxim was aware he had contacted a least one of the Companies' employees about a potential employment opportunity at SnapNurse. Maxim also informed Coats that, based on forensic evidence, it was aware he had very likely misappropriated the Companies' confidential and proprietary information.

78.     In the January 18, 2023 letter, Coats was invited to request that the Committee review its decision, and to provide any documentation or written comments that would support his request.

79.     On March 17, 2023, Coats, through his counsel, requested that the Committee review its decision and requested the documents that the Committee relied on when determining that Coats was not eligible for IIP payments. **Exhibit 7, March 17, 2023 Letter to Mary Brown.**

80.     On April 17, 2023, the Committee provided Coats' counsel documents relevant to the Committee's decision as explained in the January 18, 2023 correspondence to Coats. **Exhibit 8, April 17, 2023 Letter to Robert Stines, Esq.**

81.     In that letter, the Committee also invited Coats to submit written issues and comments to the Committee for review. ***Id.***

82.     The Committee also notified Coats that it would respond to Coats' request for review within up to one hundred twenty (120) days of the March 17, 2023 request. ***Id.***

83.     On May 22, 2023, Coats, through his counsel, submitted additional information to the Committee for consideration when assessing Coats' request for review.  **Exhibit 9, May 22, 2023 Letter to Mary Brown.**

84.     On July 11, the Committee responded to Coats' request for review and informed

16

Coats that it affirmed its adverse determination as detailed in the January 18, 2023 letter and found additional violations of Paragraph 9 of the IIP not known at the time of the original adverse determination. **Exhibit 10, July 11, 2023 Letter to Robert Stines, Esq. re David Coats Incentive Investment Plan.** Maxim also requested that Coats return the $484,180.40 IIP payment previously paid to Coats within seven (7) days due to Maxim's discovery of conduct which rendered him ineligible for the payment. ***Id.***

85.    Coats has not returned the IIP payment.

## COUNT I – ERISA § 502(a)(3)

86.    Maxim incorporates and re-alleges each paragraph of the Complaint above as though fully set forth herein.

87.    ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a civil action "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this title or the terms of the plan."

88.    Under the IIP, Coats was required to refrain from competing in the healthcare recruiting and staffing business, as described in Paragraph 9(1) of the IIP, for 30 months upon separation from employment to be entitled to receive payments under the IIP.

89.    Under the IIP, Coats was required to refrain from soliciting the Companies' employees, as described in Paragraph 9(3), for 30 months upon separation from employment to be entitled to receive payments.

90.    Under the IIP, Coats was required to refrain from soliciting, diverting or taking away any staff, temporary personnel, trade, business, or goodwill from the Companies, as described in Paragraph 9(5), for 30 months upon separation from employment to be entitled to

HB: 4881-7077-7967.8

receive payments.

91.     Coats violated multiple terms in Paragraph 9 of the IIP.

92.     The IIP does not prohibit Coats from working for a competitor but disqualifies him from eligibility for payments under the IIP if he chooses to do so (or otherwise chooses not to comply with the other terms in Paragraph 9 of the IIP).

93.     Coats had knowledge that he was violating and/or intended to violate the terms and conditions of Paragraph 9 of the IIP while receiving a payment in the gross amount of $484,180.40.

94.     Coats agreed "to refund to the Company any amounts previously paid to [him]" in the event of any breach or non-performance of the terms and conditions of Paragraph 9 of the IIP. **Exhibit 2.**

95.     Because he received payments under the IIP but chose not to comply with the terms and conditions of Paragraph 9, Coats has violated the terms of the IIP and received an overpayment of benefits that he must repay.

96.     Because he received payments under the IIP but chose not to comply the terms and conditions of Paragraph 9, Coats has been unjustly enriched which cannot be remedied unless he repays the benefits.

97.     The benefits paid to Coats in the gross amount of $484,180.40 are held by him in constructive trust and must be repaid to Maxim.

98.     Plaintiffs have no adequate remedy at law and are entitled to equitable relief directing repayment to Plaintiffs under ERISA Section 502(a)(3) and 29 U.S.C. § 1132(a)(3) to ensure repayment of $484,180.40 and an award of attorney's fees under ERISA Section 502(g) and 29 U.S.C. § 1132(g).

HB: 4881-7077-7967.8

## COUNT II – DECLARATORY JUDGMENT

99.     Plaintiffs incorporate and re-allege each paragraph of the Complaint above as though fully set forth herein.

100.    In order to be eligible for payments under the IIP, a Participant must abide by the terms contained in Paragraph 9 of the IIP for 30 months after their separation from employment with Maxim.

101.    Coats chose not to comply with the terms set forth in Paragraph 9 of the IIP.

102.    Coats' actions occurred within 30 months of his separation from employment with Companies.

103.    Therefore, Coats violated the material terms of the IIP, which are required to be eligible for payments.

104.    Plaintiffs request that under ERISA Paragraph 502(a)(3) and 29 U.S.C. § 1132(a)(3) this Court enter a declaratory judgment establishing that Coats is not entitled to or owed further payments under the IIP and award Plaintiffs attorney's fees under ERISA Paragraph 502(g) and 29 U.S.C. § 1132(g).

## COUNT III – UNJUST ENRICHMENT

105.    Plaintiffs incorporate and re-allege each Paragraphs 1 through 85 of the Complaint above as though fully set forth herein.

106.    Count III is pled in the alternative to Count I of this Complaint.

107.    In the alternative, Coats is liable to Plaintiffs for unjust enrichment and quantum meruit.

108.    Coats accepted $484,180.40 from Maxim Staffing understanding Maxim Staffing made the payment on the condition, and based on Coats' representation, that Coats would comply

19

with Paragraph 9 of the IIP.

109.    Coats retained the $484,180.40 payment Maxim Staffing made to him under the IIP knowing it was not equitable to do so after choosing not to comply with the terms of Paragraph 9 of the IIP and violating the terms of Paragraph 9 of the IIP.

110.    Coats has been unjustly enriched in an amount of $484,180.40. Under the circumstances, it is unjust for Coats to retain the $484,180.40 payment Maxim Staffing made to him.

111.    Maxim Staffing has been unjustly and inequitably damaged, and Coats has been unjustly enriched, as a result of Coats retaining the IIP payment after violating Paragraph 9 of the IIP. Coats should be required to repay the full $484,180.40 to Maxim Staffing by which he has been unjustly enriched.

112.    As a direct and proximate result of Coats' wrongful conduct, Maxim Staffing has been damaged and is entitled to be compensated for the value of its services, $484,180.40.

113.    WHEREFORE, Plaintiffs request the Court issue an order enforcing the terms of the IIP and granting it the equitable relief to which it is entitled, including that Coats must repay the $484,180.40 in benefits he has received, plus prejudgment and post-judgment interest, costs of collection, attorney fees as authorized under ERISA Section 502(g) and 29 U.S.C. § 1132(g), and such other equitable relief as the Court deems appropriate. Maxim also demands a declaratory judgment establishing that Coats is not owed further payments under the IIP.

HB: 4881-7077-7967.8

HUSCH BLACKWELL LLP

/s/ MICHAEL J. SCHRIER
Michael J. Schrier, Esq.
D. Md. Bar No. 15967
Husch Blackwell LLP
1801 Pennsylvania Ave., NW, Suite 1000
Washington, DC 20006
T: (202) 378-2313
F: (202) 378-2319
michael.schrier@huschblackwell.com

*Attorney for Plaintiffs Maxim Healthcare
Staffing Services, Inc. and Maxim
Healthcare Services Holdings, Inc.*

21